IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


**KENNETH GRISSON,**

       **Petitioner,**

  **v.**                               **Case No. 2:11-cv-194**

                                       **JUDGE JAMES L. GRAHAM**

**WARDEN, ROSS CORRECTIONAL**       **Magistrate Judge Kemp**
**INSTITUTION,**

       **Respondent.**

<u>REPORT AND RECOMMENDATION</u>

Petitioner, a state prisoner, has filed a petition for a writ of habeas corpus

pursuant to 28 U.S.C. 2254. This matter is before the Court on that petition,

respondent's return of writ, and the exhibits attached to the return. Petitioner has not

filed a traverse. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that

petitioner's claims be **DISMISSED**.

**I. PROCEDURAL HISTORY**

On June 18, 2007, a Franklin County, Ohio grand jury indicted petitioner on six

felony counts arising out of an alleged assault on Tamika Brightwell, Antonette

Brightwell, Robert Taylor, and Alfreda Hyppolite, which occurred on March 20, 2007.

The indictment contained four counts of felonious assault with firearm specifications

(one for each of the four alleged victims), one count of improperly discharging a

firearm, with the same two specifications, and one count of improper handling of a

firearm in a motor vehicle, also with a firearm specification *Return of Writ,* Exhibit One.

Petitioner pleaded not guilty and the case went to trial on August 20, 2008. On August 26, 2008, the jury convicted him of all six counts and all of the specifications. On October 1, 2008, the trial court issued a judgment entry imposing sentence. Petitioner received a total sentence of nineteen years incarceration plus three years of post-release control. *Return of Writ*, Exhibit Four. The sentencing entry was amended approximately three weeks later but the total sentence remained the same.

Petitioner timely appealed. He raised only two assignments of error:

> **First Assignment of Error:** The trial court erroneously failed to conduct a full inquiry to determine the nature and extent of any breakdown in the attorney-client relationship between Appellant and trial counsel.

> **Second Assignment of Error:** Appellant's convictions were not supported by sufficient credible evidence.

*Return of Writ*, Exhibit Seven.

In a decision dated October 29, 2009, the Tenth District Court of Appeals found no merit in these two assignments of error and affirmed petitioner's conviction and sentence. *State v. Grisson*, 2009 WL 3495054 (Franklin Co. App. October 29, 2009). The Ohio Supreme Court subsequently denied review. *State v. Grisson*, 124 Ohio St.3d 1493 (March 3, 2010).

Petitioner asserts in his petition that he also filed a post-conviction petition in the Franklin County Court of Common Pleas. Respondent states that no such petition can be located, and the Court's review of the Franklin County Clerk of Courts' website, www.franklincountyohio.gov/clerk, does not reveal that petitioner ever filed a post-

2

conviction petition. Therefore, the Court is satisfied that the return accurately states the procedural history of the cases and attaches the entire state court record.

On March 2, 2011, petitioner timely filed his petition for a writ of habeas corpus in this Court. In his petition, he raised two issues, which he has phrased as follows:

> **GROUND ONE**: 1. Assigned counsel refused to employ an investigator to verify defendant's alibi. 2. Assigned counsel refused to subpoena exculpatory witnesses. 3. Defendant's family hired counsel who was disbarred prior to trial and judge ordered original counsel to represent.

> **GROUND TWO:** 1. One felonious assault offense went unsupported by testimony of alleged victim or any witness that any assault occurred.

It is respondent's position that neither of these claims support the grant of habeas corpus relief.

## II. FACTS

The pertinent facts are stated in the state court of appeals' opinion as follows. These facts are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1); *see also House v. Bell,* 283 F.3d 37 (6th Cir.2002).

> Tameka Brightwell was on her front porch eating with family and friends at approximately 7:00 p.m. on the evening the drive-by shooting occurred. Tameka's daughter, Antonette, was present, along with Anonette's friend, Robert Taylor, who worked with Antonette. Alfreda Hyppolite and her three children were also there, along with several other friends and family members.

> Tameka testified that prior to the shooting, she heard her daughter, Antonette, shouting on the phone with another girl. Tameka was aware that Antonette had been having problems with a female she had met at

3

work. Antonette testified that the girl she was arguing with over the phone was Theresa Harper, who had recently been fired. At least one of these arguments with Theresa occurred while Antonette was on her mother's front porch. After Theresa threatened Antonette, Antonette hung up on her. Theresa then called back and gave the phone to a man who identified himself as "Kenny." Kenny wanted Antonette and Theresa to engage in a boxing match against each other. Antonette testified that Kenny informed her that he and Theresa were coming over to Antonette's house.

Approximately 10 to 15 minutes after this phone conversation ended, Antonette was talking to friends and family on the porch when she heard gunshots. Antonette testified she and her mother were on the porch and Robert was right next to the porch. Tameka testified she was on her porch standing by the steps and Antonette was on the sidewalk by the steps, while Robert was right next to Antonette. Both Antonette and Tameka testified that they observed a male firing shots at their house while driving by in a green, four-door vehicle. Antonette heard six or seven shots while Tameka testified to hearing five or six shots. Tameka testified that she was hit in the face by one of those shots when she was standing on her front porch. Antonette called 911. Police and emergency medical personnel responded and Tameka was transported to the hospital. Medical personnel treated her for injuries she received as a result of a single bullet entering and exiting the right side of her face. She was released later that night.

The Columbus Division of Police collected evidence, including spent shell casings. Photographs were also taken of the scene, including the residence. Detective Jeffrey Collins testified the investigation and the photographs revealed what appeared to be a fresh bullet strike to Tameka's residence.

The day after the shooting, Tameka was shown a photo array containing a suspect who was not the appellant. Tameka did not select anyone from that photo array. On May 18, 2007, after detectives had obtained additional information, Tameka was shown a new photo array containing a photo of the appellant. Using that photo array, Tameka identified appellant as the shooter.

Tameka also made an in-court identification of appellant as the shooter. In addition, Alfreda Hyppolite made an in-court identification of appellant

4

as the shooter. She testified that she got a very good look at the shooter as she was running to the sidewalk to protect her children after a gunshot was fired. However, Alfreda had never been shown a photo array by detectives and never identified appellant prior to trial.

Antonette was not able to identify appellant as the shooter, but she did identify Theresa Harper as the female passenger in the shooter's vehicle, via a photo array shown to her on March 21, 2007.

Theresa testified against appellant pursuant to a proffer and plea bargain her attorney negotiated with the state of Ohio in exchange for a reduced sentence. Theresa testified that she and appellant had been friends since 2004 and were both from the Hilltop area. On the date of the incident, she and appellant and a man named "HB" were driving to the home of Robert Taylor. She was the front seat passenger in a green vehicle being driven by appellant.

While appellant was driving, Theresa informed him that Antonette had called her several times that day. Appellant answered Theresa's phone the next time Antonette called. Following an unfriendly conversation, appellant advised Antonette that he and Theresa would be coming to her house and that he wanted the two of them to fight. Theresa provided appellant with directions to Antonette's house and pointed out the house and Antonette to appellant. She observed Antonette on the porch and Robert on the sidewalk in front of the house. As the car was slowing down near Antonette's house, Theresa prepared to exit the vehicle. However, the car did not stop and appellant began firing shots at the house. After the car sped off, Theresa asked appellant why he did it and he explained that he wasn't going to let anyone "send" or "play" her. (Tr. 292.)

Theresa was arrested for the shooting several hours later and was taken to jail. She testified that she spent approximately 98 days in jail. During her time in jail, Theresa testified that she did communicate with appellant using a phone at the jail and that her calls were recorded. The state of Ohio introduced portions of some of those phone calls in its case-in-chief. During some of those calls appellant and Theresa had veiled discussions regarding the incident. At least one of those calls involved a discussion of whether or not Theresa was supposed to "take the rap" for appellant. (Tr. 326.)

*State v. Grisson*, 2009 WL 3495054, at *1-3.

## III.  THE MERITS

The Court begins its discussion of petitioner's two grounds for relief by identifying the proper standard under which to review his claims.

### STANDARD OF REVIEW

The provisions of the Antiterrorism and Effective Death Penalty Act, Pub.L. 104-132, 110 Stat. 1214 (AEDPA) govern the scope of this Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir.2008).  AEDPA imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam ). *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010)(footnote omitted) .

When the claims presented in a habeas corpus petition have been presented to and decided by the state courts, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented.  28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As the Supreme Court has explained, "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005). Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.*, at 411, 120 S.Ct. 1495. Rather, that application must be "objectively unreasonable." *Id.*, at 409, 120 S.Ct. 1495. This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). The Court will apply this standard to petitioner's claims.

## A. Ground One - Relationship with Counsel

The memorandum which petitioner has filed in support of his petition for a writ of habeas corpus is basically a photocopy of the memorandum in support of jurisdiction which petitioner filed in the Ohio Supreme Court. It summarizes petitioner' first ground for relief in this way: "When an indigent defendant questions the adequacy of assigned counsel during trial, the court must conduct a full inquiry to determine the nature and extent of any breakdown in the attorney-client relationship between

7

defendant and trial counsel."  In support of that claim, petitioner argued there - and

argues here, since it is the same memorandum - that the record reflected "ongoing

tension" between petitioner and his trial counsel, including the fact that petitioner's

mother had filed a disciplinary complaint against counsel and that there was some

frustration, apparently on petitioner's part, as to how the case was being developed.

The only citation to the trial record, however, is to a colloquy appearing at pages nine

and ten, during which trial counsel discussed the disciplinary complaint.  The other

citations to the record relate to comments made by petitioner at the time of sentencing.

This is what counsel told the trial judge immediately prior to the commencement

of the trial:

> [Mr. Hayes]: The second area to bring up for the record, there was a
> bar complaint that was filed in this matter.  It was filed not by my client
> but by his mother.  That bar complaint was dismissed.
>
> Without going into the specifics of that, I wanted to place that on
> the record that it was not filed by my client.  I am not asking to be
> withdrawn from this case.  I think there's some frustration as to how the
> case is progressing and the development with it.
>
> I wanted to place that on the record and see if my client wanted to
> address that or not.  I wanted to bring that to the Court's attention as well.

*See Return of Writ,* Trial Transcript, Vol. I of II, at 9-10.

Immediately after that statement was made, which occurred with petitioner in

the courtroom, there was a discussion of the State's plea offer and the potential

maximum sentence petitioner was facing if convicted of all counts.  The trial judge

8

specifically addressed petitioner on that issue, and petitioner confirmed that he understood the position of the State and did not need any more time to consult with counsel about whether he would accept the State's offer and plead guilty. The judge did not ask about counsel's statements concerning either the disciplinary complaint or petitioner frustration with counsel, but petitioner also did not respond in any way to counsel's statement about whether he (petitioner) wanted to address that issue with the court. The trial judge then indicated that the trial would begin at 9:00 a.m. the following day. *Id*. at 14.

In his current memorandum, petitioner does not appear to distinguish between the comments made at the beginning of the trial and the comments made at the time of sentencing. Rather, lumping them all together, he argues that these comments "warranted further inquiry by the trial court to determine whether the professional relationship had deteriorated, or broken down completely." *See Petition,* at 21. The only federal case authority he cites to this Court is *United States v. Jennings*, 83 F.3d 145 (6th Cir. 1996), a case in which the Court of Appeals held that the trial judge in that case did not abuse his discretion when, after holding a hearing, he determined that the relationship between defendants and their counsel had not deteriorated to the point where counsel was prevented from presenting an adequate defense. In an earlier decision in the same case, *see United States v. Jennings,* 945 F.2d 129 (6th Cir. 1991), the Court of Appeals had held that the record was insufficient to determine if the trial judge had afforded the defendants a full opportunity to voice their concerns about counsel's

9

performance, and remanded the case for further proceedings on that issue.

The state court of appeals, which is the last reasoned decision on the merits, addressed this issue as follows:

> In his first assignment of error, appellant argues the trial court abused its discretion by failing to make a full inquiry into the "ongoing tension" between appellant and his counsel in order to determine whether there was a breakdown in the attorney-client relationship. We find this argument to be without merit.

> "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 450 N.E.2d 1140, quoting *State v. Adams* (1980), 62 Ohio St.2d 151, 404 N.E.2d 144.

> "The right to have counsel assigned by the court does not impose a duty on the court to allow the accused to choose his own counsel[.]" *Thurston v. Maxwell* (1965), 3 Ohio St.2d 92, 93, 209 N.E.2d 204. In order to discharge a court-appointed attorney, the accused must show a breakdown in the attorney-client relationship which jeopardizes his right to effective assistance of counsel. *State v. Coleman* (1988), 37 Ohio St.3d 286, 292, 525 N.E.2d 792. The accused is not guaranteed a "meaningful relationship" with his counsel. *Morris v. Slappy* (1983), 461 U.S. 1, 13-14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610. Mere personality conflicts or disputes as to trial strategy are insufficient to require appointment of new counsel. *State v. Davis* (May 19, 1998), 10th Dist. No. 97AP-1020, citing Morris. The fact that an accused disagrees with his attorney regarding trial tactics and strategy is insufficient to warrant the substitution of counsel. *State v. Alexander,* 10th Dist. No. 05AP-192, 2006-Ohio-1298. Yet, the accused is entitled to competent assistance from counsel and when he expresses a specific complaint during the course of the trial regarding counsel's effectiveness, the trial court must inquire into the nature of the complaint. *State v. Deal* (1969), 17 Ohio St.2d 17, 244 N.E.2d 742.

> In *Deal*, the Supreme Court of Ohio held that, when an accused raises a specific complaint regarding his dissatisfaction with counsel during the course of the trial, the trial court has an obligation to ensure that the record contains an adequate investigation of the complaint before

10

continuing with the trial. *Id*. at 19-20, 244 N.E.2d 742.

Here, appellant did not advise the court of any dissatisfaction with his counsel until approximately 30 days after the trial had concluded and after he had been convicted by the jury and was about to be sentenced. In *State v. Frazier*, 10th Dist. No. 05AP-425, 2006-Ohio-1475, we held that where the appellant did not raise a claim of dissatisfaction with his appointed counsel until the time of his sentencing hearing, Deal was not applicable. In *State v. Morrison*, 10th Dist. No. 02AP-651, 2003-Ohio-1517, we determined that a *Deal* inquiry was not required where a defendant's complaint was brought to the attention of the court by defense counsel during a resentencing hearing. *See also Davis* ("[w]hen * * * a defendant fails to raise specific concerns about his appointed counsel with the court during trial, we have held that the requirements of *Deal* are not implicated"). Therefore, we find that a *Deal* inquiry was unnecessary here.

To the extent that appellant argues counsel's comments to the trial court made prior to the start of the trial regarding appellant's "frustrations" with the progress of the case are enough to trigger a *Deal* inquiry, we reject that claim as well.

Immediately prior to trial, appellant did not make any complaints regarding his representation. While appellant's trial counsel advised the court that appellant may have been frustrated with the progress of the case, counsel also advised the court that he had recently located and interviewed a witness whom appellant had requested that he contact. Appellant did not offer any comments on the record with respect to this.

Additionally, regarding the issue of the bar complaint, it is significant to note that it was filed by appellant's mother, rather than by appellant, and appellant did not offer any information regarding the complaint, as the issue was raised solely by counsel. We also note that the substance of the complaint is not in the record, and appellant's counsel informed the trial court that the matter had been dismissed and therefore, it was no longer at issue. Furthermore, the mere fact that a complaint has been filed with the bar association does not in itself warrant an inquiry by the trial court. *See Alexander, supra*, at ¶ 22.

An accused bears the burden of presenting evidence that demonstrates grounds for the appointment of new counsel. If the accused alleges facts that, if true, would require relief, then the trial court must inquire into the

11

complaint and make that inquiry a part of the record. *Alexande*r at ¶ 16, citing *State v. Smith* (Dec. 29, 1998), 4th Dist. No. 98CA12.

In the instant case, the record does not contain specific facts or evidence that warrant a further inquiry, as appellant did not make a specific complaint regarding his counsel until the time of the sentencing hearing. Therefore, based upon the reasons set forth above, we find the trial court did not abuse its discretion in failing to conduct a full inquiry. Accordingly, we overrule appellant's first assignment of error.

*State v. Grisson, supra,* at *4-5.

As an initial matter, the Court agrees that the comments made immediately prior to sentencing could not form the basis for any alleged constitutional violation. At that point, the trial was over, and the comments made by petitioner did not relate to the only remaining issue before the trial court, which was sentencing. Therefore, even if a hearing had been held at that point, nothing could have been accomplished except, perhaps, laying the groundwork for a motion for a new trial - a motion that petitioner never filed. Thus, the real issue here is whether the state trial court violated petitioner's right to the effective assistance of counsel by not inquiring further about the comments made by counsel on the day before the trial; or, to put it more precisely, whether the state court's determination that no such constitutional violation occurred either was contrary to, or represented an unreasonable application of, well-established federal law as it existed on the date of the court of appeals' decision. *See Greene v. Fisher,* __ U.S. __, 80 U.S.L.W. 4013 (November 8, 2011).

The state court relied heavily on the Ohio Supreme Court's decision in *State v.

12

*Deal*, 17 Ohio St.2d 17 (1969) in analyzing this question.  *Deal* was a relatively brief decision which did not cite to any federal law, but which, in the context of determining if the defendant had been "denied effective of assistance of counsel," held that when a defendant makes a specific objection during trial to counsel's performance - in that case, counsel's alleged failure to file a notice of alibi defense and to subpoena witnesses - the trial court has an obligation to make a further inquiry in order to insure that the defendant's right to the effective assistance of counsel is protected.

This issue does not often come up simply on the basis of stray comments made during the course of trial or pretrial proceedings.  Rather, it usually arises in the context of a formal motion or oral request made by a criminal defendant to remove or substitute counsel, something which did not occur here.  When such a motion is presented and denied, a reviewing court is required to engage in a multi-factor inquiry which requires consideration of the timing of the request, the adequacy of the trial court's inquiry into the underlying facts, the extent of the conflict between the defendant and the attorney, the extent to which that conflict rendered meaningful communication difficult or impossible, and whether allowing substitution of counsel would have prejudiced the interests of justice.  *See, e.g., United States v. Vasquez,* 560 F.3d 461, 466 (6th Cir. 2009); *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001).

Here, to the extent that these factors apply, the failure of the defendant to make any request - even when invited by his counsel on the record to do so - for a new attorney weighs heavily against any constitutional violation.  The only time he

13

expressed any dissatisfaction with counsel, at least on the record, was at sentencing, which was far too late in the day to have had any effect on the trial itself. It is true that the trial judge did not make a specific inquiry into the facts related by counsel on the day before the trial, but the Court has not located any cases suggesting that on this sparse of a record, such an inquiry is constitutionally mandated. To the contrary, even an ambiguous statement from a defendant on this issue has been held not to trigger an absolute duty on the part of the trial court to make further inquiry. *See, e.g, Romero v. Furlong*, 215 F.3d 1107, 1114 (10th Cir. 2000); *cf. United States v. Lott,* 310 F.3d 1231, 1249 (10th Cir. 2002)(duty to inquire is triggered when "a defendant makes sufficiently specific, factually based allegations in support of his request for new counsel ..."); *United States v. Iles*, 906 F.2d 1122, 1131 (6th Cir. 1990) ("The need for an inquiry will not be recognized, however, where the defendant has not evidenced his dissatisfaction or wish to remove his appointed counsel").

As to the second and third factors, it is impossible to tell from this record if there had been either an extensive history of conflict or an irretrievable breakdown in communications between petitioner and his attorney, in large part due to petitioner's own failure to address the issue when invited to do so by trial counsel. Certainly, there is no evidence in the record of such a breakdown prior to trial, and there is evidence to the contrary in the form of the questions posed to petitioner about his understanding of the State's plea offer and whether he needed more time to discuss it with counsel. It would have been very easy for petitioner to respond at that point that he was unable to

14

communicate effectively with counsel about that or any other subject, but he did not. Under these circumstances, the Court cannot find that the state appellate court's decision on this issue is either contrary to any well-established federal constitutional principals, or an unreasonable application of the test described in *Vasquez* and many other federal court decisions which have dealt with this type of issue. Therefore, petitioner's first ground for relief lacks merit.

## B. Sufficiency of the Evidence

Petitioner's second claim is that the evidence was insufficient to support his conviction. Again, as he framed this argument in his memorandum in support of jurisdiction filed with the Ohio Supreme Court, and repeated here as part of his habeas corpus petition, that there was "minimal evidence" to support the assault conviction with respect to Robert Taylor, who was somewhere in the vicinity when the shots in question were fired, and that the evidence linking petitioner to the shooting was "subject to challenge." *See Petition*, at 23.

Such a challenge to the sufficiency of the evidence, when made in a habeas corpus petition subject to the AEDPA, must meet an exacting standard. As this Court explained in *Lynch v. Hudson*, 2011 WL 4537890, *81-82 (S.D. Ohio September 28, 2011):

> In *Jackson v. Virginia* {443 U.S. 307 (1979)], the United States Supreme Court held that as a matter of fundamental due process, a criminal conviction cannot stand unless each essential element is proven beyond a reasonable doubt. 443 U.S. at 316. The Supreme Court explained that when reviewing a challenge to the constitutional sufficiency of the evidence supporting a criminal conviction, "the relevant question is

15

whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. The Supreme Court cautioned, with respect to the role of a reviewing court, that "[t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. Thus, after reviewing the evidence in a light most favorable to the prosecution and respecting the trier of fact's role in determining witnesses' credibility and weighing the evidence, a federal court must grant habeas corpus relief "if it is found that upon the record evidence at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id*. at 324.

It is important to remember when reviewing a sufficiency of the evidence challenge that this Court "do[es] not reweigh the evidence, re-evaluate the credibility of the witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir.2009). If the record contains credible, competent evidence enabling a rational jury to find each essential element beyond a reasonable doubt, then Petitioner's challenge to the sufficiency of the evidence fails. *Cf. Matthews v. Abramajtys*, 319 F.3d 780, 788–89 (6th Cir.2003) ("The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim.").

*Further, as the Sixth Circuit has explained, "[i]n a habeas proceeding, however, we cannot simply conduct de novo review of the state court's application of [the *Jackson v. Virginia*] rule, but must review its sufficiency-of-the-evidence decision under the highly deferential standard of the AEDPA." *Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir.2008). In *Tucker v. Palmer*, 541 F.3d 652 (6th Cir.2008), the Sixth Circuit explained in more detail:

> Accordingly, the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by Jackson; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by the AEDPA.

*Id*. at 656. *See also Parker v. Renico*, 506 F.3d 444, 448 (6th Cir.2007); *Nash v.*

16

*Eberlin*, 258 F. App'x 761, 765 (6th Cir.2007). This Court recognizes, however, that "even after AEDPA, [the Court] must 'distinguish reasonable speculation from sufficient evidence' when reviewing a state court's application of *Jackson*." *Smith v. Romanowski*, No. 07–1578, 2009 WL 1884451, at *6 (6th Cir. Jul.1, 2009) (Moore, J., dissenting) (quoting *Brown v. Palmer*, 441 F.3d 367, 352 (6th Cir.2006)).

The state court of appeals identified the correct legal standard under which to evaluate this claim, citing to *State v. Thompkins*, 78 Ohio St.3d 380 (1997), which, in turn, cited to *Jackson v. Virginia*. The state court reasoned as follows:

Appellant argues the evidence identifying him as the shooter is subject to challenge under a sufficiency and manifest weight review. We disagree.

Although the events of the drive-by shooting may have happened very quickly, leaving little time for witnesses to observe the events, several witnesses were able to identify appellant as the shooter. Tameka positively identified appellant from a photo array and also made an in-court identification. Appellant has failed to raise a legitimate challenge to the photo array presented to Tameka. In addition, Antonette testified that she had been on the phone with a man identified as "Kenny" just minutes before the shooting who stated he was on his way over to her house with Theresa. Antonette identified Theresa as the passenger in the vehicle from which the shots were fired. Theresa, who has known appellant for several years, testified that he was the shooter.

The recorded jail calls between appellant and Theresa also corroborate the identification of appellant as the shooter, as it can be inferred from the conversations that appellant was involved and wants Theresa to take the fall because he does not want to go to jail. Finally, although the identification by Alfreda could have possibly been stronger if she had been shown a photo array and selected appellant as the shooter prior to making an in-court identification, the jury was free to consider the credibility of the witnesses. We cannot say, based upon all of the identification testimony, that reasonable minds could not have arrived at the conclusion that appellant was the shooter, nor can we say that the jury

clearly lost its way in reaching that determination.

Next, appellant challenges the testimony of his co-defendant on the grounds that her testimony should be carefully examined because she received a substantial benefit as a result of her cooperation, which resulted in a sentence of community control, rather than prison. However, the jury was aware early on of the "sweetheart deal" that Theresa received in exchange for her truthful testimony. (Tr. 46.) Furthermore, the jury instructions provided by the court contained language advising the jurors that the testimony of a co-defendant or accomplice was "subject to grave suspicion" and should be "weighed with great caution." (Jury Instructions, R. 185 at 5.) Based upon this, we cannot say that a reasonable jury would not carefully examine Theresa's testimony and, considering the corroborating testimony of the other witnesses, conclude that appellant was the shooter.

Finally, we find appellant's assertion that only minimal evidence existed to convict him of felonious assault on the count involving Robert Taylor is without merit.

The applicable provision of the felonious assault statute found in R.C. 2903.11(A)(2) provides in relevant part: "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *." "Attempt" is further defined as purposely or knowingly engaging in conduct that, if successful, would constitute or result in the offense. R.C. 2923.02(A). "Deadly weapon" is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). This includes a firearm or handgun such as the one used in this incident. See generally R.C. 2923.11.

In *State v. Phillips* (1991), 75 Ohio App.3d 785, 792, 600 N.E.2d 825, a case similar to the instant case, the defendant randomly fired at least five shots in the direction of the victims during a drive-by shooting. As a result, several individuals were injured. Phillips was convicted of five counts of felonious assault. On appeal, Phillips argued the evidence did not support his convictions because there was no testimony that he had aimed the weapon at a particular individual. However, the court of appeals found that his "intent to cause physical harm to the five individuals could be

18

inferred from his having shot a gun randomly in the direction of each individual." *Id.*

In *State v. Thompson* (Nov. 10, 1997), 10th Dist. No. 97APA04-489, we also held that an attempt to cause physical harm may be inferred from the act of firing a gun in the direction of an individual. ("When appellant fired the gun in the direction of [the victim], he committed an overt act sufficient to support the finding that he knowingly attempted to cause physical harm.")

Firing a weapon randomly in the direction of individuals who are arguably within range of the shooter is sufficient to demonstrate an attempt to cause physical harm. *Phillips* at 792, 600 N.E.2d 825. The firing of the gun alone is sufficient evidence of intent to cause physical harm. *Id. See Thompson* and *State v. Gray*, 10th Dist. No. 04AP-938, 2005-Ohio-4563 (intent to cause or attempt to cause physical harm is inferred by shooting the gun in the direction of the victim). *See also State v. Windom* (Dec. 30, 1997), 10th Dist. No. 97APA03-370 (given the proximity of the victims to one another, who were standing in a group, it was reasonable to infer that the defendant's conduct created a substantial risk of serious physical harm to all of the persons in the group).

Here, the testimony supports the conclusion that Robert was standing in the very area where the shots were fired. Antonette and Tameka testified to hearing anywhere from five to seven shots. The state of Ohio introduced photographic evidence and testimony demonstrating that it was likely at least one of the bullets fired during the shooting struck Tameka's house. Tameka, who was on the porch, was also struck by one of those shots. Tameka testified that Robert was standing next to Antonette who was next to the steps leading to the porch in front of the house when the shooting occurred. Antonette testified that Robert was standing next to the porch when shots were fired, and Theresa testified that Robert was standing in front of the house on the sidewalk as the car approached the residence. A review of the photographs submitted into evidence reveals that the porch, steps, sidewalk, and front yard at 1022 Wilson Avenue encompass a very small area. Thus, the evidence supports the conclusion that Robert was in very close proximity to both Antonette and Tameka. Therefore, appellant's intent to cause physical harm to Robert is inferred by the fact that he shot the gun several times in the direction of Robert

Taylor and others who were gathered on or around the porch of Tameka's residence, even though the bullets only struck Tameka.

Therefore, viewing the evidence in a light most favorable to the state, we find that a rationale trier of fact could have concluded that appellant knowingly attempted to cause physical harm to Robert Taylor.

*State v. Grisson, supra*, at *7-9.

Taking the issues in the order petitioner has raised them, the state court's determination that a reasonable jury could have found that Robert Taylor was the victim of an assault was not an unreasonable application of the *Jackson* standard.  As the court of appeals points out, all four of the alleged assault victims were standing in a very small area when petitioner drove by and fired between five and seven shots.  The shots were fairly widely scattered.  The jury certainly could have inferred that Mr. Taylor was within a zone of danger and that petitioner was not that particular about whom, if anyone, his shots actually hit.

To be sure, there are situations where someone who is near to the scene of drive-by shooting cannot properly be classified as a victim of an assault.  For example, in *State v. Abuan*, 161 Wash. App. 135 (2011), the court set aside a conviction for assault of an alleged victim who was present in a house during a drive-by shooting because there was no evidence that the defendant knew of the victim's presence, and all of the shots were directed toward the garage in which

20

the intended victims were located rather than at the house.  Here, by contrast, Mr. Taylor was present and visible at the scene, and the jury could reasonably have inferred that the shots were directed at a group of people and not any specific individual.  Nothing more was needed to support a conviction for the assault on Mr. Taylor.

Petitioner's argument about the sufficiency of the evidence proving that he was the shooter is even less compelling.  As the state court of appeals observed, this was not a case where the evidence that petitioner was the shooter was purely circumstantial.  Rather, petitioner's friend, Theresa Harper, who was exchanging telephone calls with Antonette Brightwell just before the shooting, testified as an eyewitness, stating that she was in the car being driven by petitioner, that he drove to the location of the shooting, that petitioner fired the shots as she was attempting to get out of his car, and that he provided her with an explanation for his actions.  Even if this had been the only testimony presented on the issue of identification, and even though the State had made concessions to Ms. Harper in exchange for her testimony, the jury was free to believe her.  *See United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004) (uncorroborated testimony of an accomplice can support a conviction, and whether that testimony was influenced by the prospect of a reduced sentence "is for the jury to decide").

Of course, Ms. Harper's testimony was not the only evidence linking

petitioner to the crime. As the court of appeals' recitation of the evidence indicates, several of the victims also picked petitioner's picture out of a photo array and some of them identified him in the courtroom. It was certainly within the province of the jury to believe some or all of that testimony. The state court's conclusion that, drawing all inferences in favor of the jury's verdict, the evidence was sufficient to support a finding that petitioner was the shooter is neither contrary to nor an unreasonable interpretation of *Jackson v. Virginia*. Because that is so, there is no basis for granting petitioner any relief on his second claim.

## IV. RECOMMENDED DISPOSITION

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that the petition for a writ of habeas corpus be **DISMISSED**.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge

22

with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).


/s/ Terence P. Kemp
United States Magistrate Judge